TERESA R. TRACY, ESQ. (SBN 89609)
Email:  ttracy@gladstonemichel.com
GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC
4551 Glencoe Avenue, Suite 300
Marina del Rey, CA  90292-7925
Tel:  (310) 821-9000 • Fax: (310) 775-8775

Attorneys for Defendant
AIRCRAFT SERVICE INTERNATIONAL, INC.

KEITH A. JACOBY, ESQ. (SBN 150233)
Email:  kjacoby@littler.com
LITTLER MENDELSON P.C.
2049 Century Park East, 5th Floor
Los Angeles, CA  90067-3107
Tel:  (310) 553-0308  •  Fax: (310) 553-5583

Co-Counsel for Defendant
AIRCRAFT SERVICE INTERNATIONAL, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PERRY, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>vs.<br><br>AIRCRAFT SERVICE INTERNATIONAL, INC. and DOE ONE THROUGH AND INCLUDING DOE ONE HUNDRED,<br><br>     Defendants.<br>_____ | CASE NO. CV13-00059-SVW (AGRx)<br><br>**DECLARATION OF GUILLERMO MARRON IN SUPPORT OF AIRCRAFT SERVICE INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>*Under Separate Cover:*<br>*(1) Motion for Summary Judgment;*<br>*(2) Declarations of Tony Lefebvre, Brian Davis, and Teresa R. Tracy;*<br>*(3) (Proposed) Separate Statement;*<br>*(4) Request for Judicial Notice;*<br>*(5) (Proposed) Judgment*<br><br>Date: November 17, 2014<br>Time: 1:30 p.m.<br>Ctrm: 6 |

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

I, Guillermo Marron, declare as follows:

1.     I currently am, and have been since June 1, 2014, the Fueling Operations Manager for Aircraft Service International, Inc. ("ASII") at Los Angeles International Airport ("LAX"). From July 26, 2010 to May 30, 2014, I was the Airlines Services Manager for ASII at LAX in charge of Department 145. Department 145 provided ground handling services to several cargo air carriers at LAX. As the Airlines Services Manager, I had overall responsibility for the cargo ramp services provided by Department 145. Prior to becoming the Airlines Services Manager, I was the Shift Duty Manager for Department 145. As the Shift Duty Manager, I oversaw cargo operations on the "p.m. shift" (from approximately 3:00 p.m. to midnight) to ensure that cargo ramp agents on that shift were following procedures and meeting the air carrier customers' needs. Prior to becoming the Shift Duty Manager, I was an Operations Supervisor II from October 19, 2007 to July 25, 2010, at LAX with operational supervisory responsibility for Department 145.

2.     I make these statements on the basis of my own personal knowledge and if called as a witness could competently testify thereto.

3.     As the Airline Services Manager of Department 145, I was responsible for the overall operation of that department, including cargo air carrier relations, compliance with contractual obligations on the part of ASII both with respect to its contract with its cargo air carrier customers and with LAX, and employees who were employed in that department.

### *Overview of ASII's Services*

4.     ASII provides into-plane fueling, ground handling services, and passenger services to commercial air carriers ("Services") at LAX. The Services that ASII provides to its air carrier customers are services that air carriers' employees can, and often do. LAX is one of several airports in California where

ASII provides these Services.  Cargo ground services (sometimes called cargo ground handling servicer) is a specialized kind of ground handling service.  Cargo differs from passenger baggage both in the range of items, size and weight of items, and special needs of certain kinds of cargo.  Thus, it requires employees with more training and skills than other kinds of baggage ground services.

5.     At LAX, Department 145 and the employees in Department 145 exclusively provided cargo ramp services to cargo air carriers.  Christopher Perry was employed in Department 145 as a cargo ramp agent [or operator].

6.     During the period November 30, 2008 until the Department 145 cargo ramp agents were laid off, ASII cargo ramp agents in Department 145 provided cargo ramp agent support at LAX to major international cargo air carriers such as China Airlines Cargo, Cathay Pacific Airways Cargo, LAN Cargo, Asiana Airlines Cargo, Singapore Airlines Cargo, Lufthansa German Airlines Cargo, Polar Air Cargo, Inc., EVA Airways Cargo, and Aeromexico Cargo, as well as domestic cargo air carriers.  The aircrafts that Department 145 serviced were 100% cargo air carriers.

7.     By November 2013, Department 145 contracts that had been in place were allowed to expire or were terminated.  ASII stopped providing the traditional cargo ramp services at LAX that had been done by Department 145.  All of the cargo ramp agents in Department 145 at that time were laid off.

***Cargo Ground Handling Services***

8.     Cargo ramp agents in Department 145 had three different hourly positions, which have been known by different titles at different times, i.e., cargo ground service, union (also known as ground service or cargo ramp agent), lead ground service, and ground service supervisor (also known as Ground Service Supervisor II).  The "ramp" is the defined area at the airport where the aircraft

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

CV13-00059-SVW (AGRx)
DECLARATION OF GUILLERMO MARRON

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1    parks for the purposes of loading and unloading cargo, refueling, and related

2    activities.  It is sometimes called the "apron."

3         9.     A true and correct copy of the job description used by ASII for the

4    cargo ramp agent position is attached to this Declaration as Exhibit 1 and by this

5    reference it is incorporated herein.  I provide more details about these duties below.

6         10.     A true and correct copy of the job description used by ASII for the

7    lead position is attached to this Declaration as Exhibit 2 and by this reference it is

8    incorporated herein.  I provide more details about these duties below.

9         11.     A true and correct copy of the job description used by ASII for the

10    supervisor position is attached to this Declaration as Exhibit 3 and by this reference

11    it is incorporated herein.  I provide more details about these duties below.

12         12.     ASII's cargo air carrier customers closely monitored flight delays.

13    ASII could be penalized if its employees were found to be the cause of the delay.

14    For example, I would get calls in the middle of the night from the carrier

15    complaining that a piece of ASII equipment broke down and would cause a delay,

16    thus resulting in the air carrier's crew for that aircraft "timing out."  If a crew was

17    "timed out," the carrier had two choices: ground the flight until the crew had the

18    specified amount of time off, or bring another crew in.  Either way, it increased the

19    crew-related labor cost to the carrier and further delayed the flight.

20         13.     The cargo air carriers were focused on providing competitive service

21    to their own cargo customers with on-time delivery of cargo in undamaged

22    condition at a designated airport at a competitive price.  A delayed flight meant

23    delayed delivery times and dates for cargo to the ultimate end user customers.

24    One of their major concerns was if the cargo was perishable such as fresh and

25    frozen food, medical supplies (e.g., blood), or flowers.  A delay could result in the

26    spoilage or other degradation of the cargo, which could result in the loss of

27    hundreds of thousands of dollars of cargo on one flight alone.  It was not

28    uncommon for cargo air carriers to transport live animals whose health and welfare

could be adversely impacted by a delay.  Cargo air carriers sometimes transported critical military equipment or supplies.  There were also ad hoc[1] emergency needs, such as emergency aid destined for a location that had just had a natural disaster such as a major earthquake or flood.

14.     In addition to the cargo-related concerns about delays, some airports used by the cargo air carriers that ASII serviced had strict "quiet" or "no-fly" time limitations on landings and takeoffs.  Therefore, even a short delay caused by ASII could result in the aircraft not being able to take off because it would arrive at the destination airport during a "quiet" or "no-fly" time.  This meant that the delay could result in the aircraft not being able to leave as scheduled.  Again, this often meant that the flight's crew "timed out."

15.     Cargo air carriers typically had a very short turn-around time between the arrival of the aircraft at the ramp and the scheduled departure time.  A delayed departure time created problems not only for that aircraft and its cargo, but would have a "cascade" effect on other aircrafts.  If an aircraft was delayed at the ramp, that aircraft could block the ramp where it was parked from being used by other arriving aircraft.  Blockage of a ramp could cause arriving aircraft to be held on the runway or tarmac or denied landing by traffic control.  Ramp blockages could adversely affect other air carriers' timely access to runways and ramps.  Back-up due to a delay could adversely impact other airports.

16.     In many cases, LAX was not the final destination of the cargo.  Delays could affect other transportations, such as other cargo flights or commercial passenger flights transporting cargo.

17.     For all of the above reasons and others, cargo air carriers insisted that ASII cargo ramp service be completed in a timely fashion.  ASII could not use an employee's meal or rest break to excuse or justify a ground service-related delay.

---

[1] "Ad hoc" cargo flights were chartered aircraft without a set schedule.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

18.     ASII scheduled its employees based upon the flight schedules provided by the air carriers it serviced.  Some of the cargo air carriers provided ASII with the anticipated schedule of their flights.  However, that schedule was almost never accurate.  ASII did not rely on it except for the most general of purposes, because flights would frequently arrive as much as an hour after the scheduled arrival time.  Accurate, real-time information regarding flights that was provided by the carriers varied greatly.  The unreliability of scheduled flight times was due to a variety of reasons such as weather-related delays at the airport of origin or LAX, load characteristics, variations in weather and wind conditions during flight, gate holds at the airport of origin or LAX, or the cargo air carrier's decision to delay a flight because it was waiting for additional high priority cargo to fill its aircraft.

19.     Cargo air carriers notified ASII of their estimated time of arrival ("ETA") and the estimated time of departure ("ETD"); ASII received the ETA and ETD from its cargo air carrier customers once the aircraft was "wheels up," i.e., it had actually departed and was in the air.  However, even in those cases the ETA was at best an estimate of when the aircraft would arrive at LAX.  In some instances weather-related issues resulted in diverted aircraft to an alternate airport, e.g., when fog closed LAX.  Generally, the cargo air carrier did not update ASII once it had given ASII the ETA, unless there was going to be a very long delay in the actual arrival time, such as if the aircraft was diverted to another airport.

20.     Depending on which runway the aircraft was directed to use by the airport control tower, which was not provided to the air carrier or ASII, it could be as little as a few minutes to approximately 20 minutes between the actual arrival time, (the point at which the aircraft is "wheels down," i.e., has actually touched down on the runway) and the aircraft's arrival at the assigned ramp area.

21.     Cargo air carrier customers do not always have regular scheduled flights.  Rather, on an ad hoc basis, their first contact with ASII would be when the

1  aircraft was "wheels up," and periodically ASII was first notified just before the

2  aircraft was due to land.

3      22.    There was a very high degree of unpredictability in the cargo ramp

4  services due to the nature of the customers and their requirements and all the issues

5  described above.  During my many years of working for ASII with responsibility

6  for the Department 145 cargo ramp services, I have had extensive opportunity to

7  observe patterns and trends in cargo flights serviced by Department 145 and

8  extensive experience trying to meet cargo air carrier requirements despite the

9  unpredictability.  I was required on a daily basis to deal with cargo air carrier

10  flights that did not land on time for one reason or another.  Based on my

11  experience, I estimate that approximately 10% of the cargo flights handled by

12  Department 145 landed earlier than the ETA, often as much as 15 to 30 minutes

13  early.  I estimate that well over half of the cargo flights landed later than the ETA,

14  and of these a very high percentage were close to 30 minutes later than the ETA.

15  In addition, the nature of the cargo presented a widely diverse and unpredictable

16  factor.  For example, the time it took to unload or load a live elephant was very

17  different from the time it took to unload or load cargo that was already palletized[2]

18  or individual boxed items of varying sizes and weights.  Occasionally, ASII

19  handled long or heavy items that required specialized equipment, such as a crane

20  or additional crew member, to unload and load the cargo.

21      23.    ASII and its cargo ramp agents performed their work on a tight

22  schedule.  They often had to rapidly adjust their priorities and schedules to meet

23  delays and other circumstances beyond ASII's control or advance knowledge with

24  respect to the time the aircraft actually arrived at the ramp to be marshaled in so

25  that the cargo ramp services could start.  Regardless of the timing of the aircraft's

26

27  _____

28     [2] Cargo that was stacked on pallets and secured with shrink wrap or netting.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

CV13-00059-SVW (AGRx)
DECLARATION OF GUILLERMO MARRON

arrival at the ramp area, ASII and its cargo ramp agents were required by the air carriers to complete the cargo ramp services within specified ground times.

24.     Cargo ramp agents in Department 145, including Mr. Perry, were represented by the United States Workers Union, IUJAT ("Union").  ASII and the Union had collective bargaining agreements that covered the terms and conditions of employment for their employees.  I am generally familiar with the Collective Bargaining Agreements between ASII and the Union ("CBAs") that covered cargo ramp agents in Mr. Perry's department.  There was a CBA which was effective from April 1, 2010 to January 31, 2013 ("2010 CBA").  There was a subsequent CBA which was effective from February 1, 2013 to January 31, 2018 ("2013 CBA").  True and correct copies of the 2010 CBA and the 2013 CBA are attached to this Declaration as Exhibits 4 and 5, respectively, and by this reference they are incorporated herein.

25.     Article 3 and Appendix A of both the 2010 CBA and the 2013 CBA contained language that allowed supervisors and other employees not in the bargaining unit to perform the work of the cargo ramp agents to allow them to "pitch in" and provide assistance where needed to avoid delays of aircraft that might be attributable to ASII.

### General Description of the Cargo Ground Services at the Ramp

26.     ASII's cargo air carrier customers that used LAX Department 145 cargo ramp agents generally had a cumulative total of between seven and nine cargo flights per day.  The two busiest air cargo times were Wednesday nights and Saturday nights starting at approximately 9:00 p.m. and ending at approximately 8:00 a.m. the next day.

27.     More than one cargo air carrier regularly used the same cargo ramp.  A map of the LAX cargo ramps showing the location of some of the cargo ramp areas and gates at LAX and some of the cargo air carriers that typically used them

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

(whether or not they were customers of ASII at any given time) is attached to this Declaration as Exhibit 6 and by this reference it is incorporated herein.

28.     The crews in Department 145 were generally made up of between seven to eleven employees, i.e., two ASII cargo ramp supervisors (or one supervisor and one lead) and five to nine cargo ramp agents.  The crews assigned to the two air carriers that Mr. Perry was typically assigned to were made up of between 10 and 11 employees, i.e., two cargo ramp supervisors (or one supervisor and one lead) and between eight to nine cargo ramp agents.

29.     The following is a generalized description of the typical order and nature of the cargo ground service that ASII provided for each flight.  I cannot be specific due to the high degree of variability and unpredictability of the actual flights themselves as well as the nature of their cargo.

30.     Once a cargo air carrier notified ASII that an aircraft was "wheels up" and gave ASII the ETA for that aircraft, ASII began to assemble a crew to provide cargo ground services for that aircraft.  ASII had to account for the following when scheduling crews: the employees for the crew must be trained to work on the type of aircraft and on the air carrier's requirements.  The crew consisted of employees who could perform all required activities.  For most of its operations, ASII scheduled employees to arrive between 30 minutes (for air carriers with palletized cargo) and 1.5 hours (for carriers with short turn ground times) before the aircraft's ETA.  ASII cargo ramp agents typically had some "downtime" after gathering equipment or unloading the aircraft before the outbound cargo was ready to be loaded.

31.     When the full crew of cargo ramp agents had arrived and punched the time clock to start work for a given flight, they were given a preflight briefing where they were advised of any special information that ASII had about the incoming cargo, and any other matters that were important to their work.  The supervisor and crew would then get in a van and the supervisor would drive the

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1    van around the airport to locate the equipment, owned or leased by ASII, which
2    was often used by other ASII employees.  Although uncommon, at times the
3    equipment was borrowed by other airport operators leaving them scattered around
4    LAX.  ASII cargo ramp agents were exclusively the persons who operated this
5    equipment during the aircraft's ground time at the ramp.  This equipment included,
6    but was not limited to, cargo loaders ("K-loaders"; representative photos attached
7    as Exhibit 7), transporters, pushback equipment (used to push the aircraft away
8    from the cargo ramp), belt loaders, ground power units that supply electricity as
9    needed, air conditioning units, tow unit and bar (used to tow the aircraft to its
10   parking spot on the ramp), tail stands for 747 aircraft, tugs, dollies, baggage carts,
11   light units, and forklifts.  Most of this equipment is very expensive and used to
12   unload cargo varying in weight from 8,000 and 11,000 to as much as 50,000-
13   60,000 pounds.  Once located, the equipment would then be fueled if needed and
14   driven to the ramp area to await the arrival of the aircraft.  Because the equipment
15   could be used for more than one air carrier, the air carriers who used ASII's cargo
16   ramp services did not have to make this investment themselves, nor did they have
17   to maintain, house or repair the equipment.  Once all necessary equipment was
18   located and inspected to ensure it was in good working order, the employees could
19   have had downtime.  However, as equipment was spread over the entire airport and
20   occasionally required maintenance, this downtime was not guaranteed.

21        32.    After gathering the required equipment, ASII was responsible to
22   conduct a "foreign object debris walk" ("FOD") in which a line of cargo ramp
23   agents inspected the cargo ramp area to identify and correct any conditions that
24   might make it unsafe for the aircraft, its cargo, or ASII employees.  This included
25   such things as picking up and removing trash or debris, cleaning up spills of liquid,
26   and noting any other hazards such as damage to the surface of the cargo ramp area
27   that would have to be reported and avoided.  A tiny screw on the ground could be
28   sucked into an aircraft engine and destroy it.

10

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

33.    ASII's cargo ramp agents also had to retrieve outbound cargo to be loaded onto the aircraft from the warehouse to the cargo ramp and arrange it for optimum loading.  This usually required ASII to make multiple trips between the ramp and the carrier's warehouse.[3]  The amount of time that this took depended upon several factors:  the distance between the cargo ramp being used and the air carrier's warehouse; the nature and amount of outbound cargo; whether palletized cargo, live animals or individual boxes.  Certain items of cargo required special handling, such as perishables or live animals.  The arrangement of the cargo at the ramp depended on the nature and amount of the cargo and the particular loading plan that the air carrier used.  ASII almost never got advance information about any aspect of the outbound cargo, so it could not predict with certainty how long this part of the cargo ramp operations would take.

34.    Nevertheless, it had to accomplish the work in time for all of the ramp agents to be back at the cargo ramp, together with all of the necessary equipment, and with the outbound cargo assembled and arranged prior to the aircraft's ETA.  For some carriers, 30-40 minutes was allotted to these duties, for some carriers it was 60 minutes, and in one case it was 90 minutes.  There was often a short period of down time between the completion of the effort previously described and the aircraft's actual arrival at the cargo ramp area.  This was particularly true when the aircraft was late, was directed to land on a runway that involved more taxi time to the cargo ramp, or was delayed during taxi for some reason.  However, if the aircraft landed early, the down time was limited or did not exist.

35.    Once the aircraft approached the cargo ramp, the ASII cargo ramp agents engaged in a variety of duties.  One cargo ramp agent was assigned to marshal (guide) the aircraft in.  Another cargo ramp agent was assigned to connect

---

[3]  In some instances the warehouse was adjacent to the ramp area where the aircraft would arrive.  In other circumstances, the warehouse could be as much as 15-20 minutes away.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1  the tow bar to the aircraft, and one to operate the piece of equipment that actually

2  towed the aircraft to its final parking spot at the cargo ramp.  Another cargo ramp

3  agent was assigned to chock the aircraft's wheels (put blocks on the ground in

4  front of and behind the wheels) immediately upon the aircraft parking.  Other

5  cargo ramp agents were assigned to set up cones under the wings to designate a

6  safety area to help keep equipment and cargo from coming into contact with the

7  aircraft during the unloading and loading process.  It was only after the cones were

8  in place that other equipment such as a K-loader, belt loader, tugs or dollies were

9  allowed to approach the aircraft.  Two cargo ramp agents were typically assigned

10 to stabilize the aircraft by attaching the tail stand.[4]  One or two employees were

11 assigned to make a visual inspection of the exterior of the aircraft and report to

12 ASII and the carrier regarding any damage or other irregularities that they

13 observed.  Other cargo ramp agents would maneuver the K-loaders and belt

14 loader(s), as appropriate, into position on one or both sides of the aircraft,

15 depending on the configuration of the cargo doors on the aircraft.  Other cargo

16 ramp agents connected their tugs to the cargo dollies and approached the aircraft.

17 Once the K-loader was in position at the main deck, an ASII cargo ramp agent

18 would inspect the cargo door and open it if safe to do so.

19      36.     The ASII crew of cargo ramp agents was divided into four teams, i.e.,

20 the bag/cargo runners, the upper (main) deck team, the lower deck team, and the

21 ground crew.  The decks refer to the two cargo deck areas that are generally on

22 each cargo aircraft.  Each deck has its own cargo door.  The cargo ramp agent

23 assigned to be the K-loader operator for a deck would remain on the bridge of the

24 K-loader where the K-loader controls were.  Another cargo ramp agent would be

25 assigned to enter the aircraft and operate the aircraft's main control panel that

26 _____

27      [4] A tail stand, sometimes called a tail post, is a sturdy rod that supports the tail of
the aircraft to help prevent the tail from touching the ground as the result of changes in

28 the aircraft's balance during the unloading and loading process.

controlled the aircraft's hydraulic cargo system used to move cargo around inside the aircraft. The main control panel is inside the aircraft and a part of the aircraft itself. Two other cargo ramp agents would typically be assigned to work inside the aircraft on each deck, to lower and raise the aircraft's floor locks that secured the cargo pallets in position within the aircraft and to assist in moving the cargo for unloading.

37.     Each air carrier had its own employee commonly called a plane-side representative onsite during the unload and load process. The plane-side representative would monitor the handling of the flight and give loading instructions to ASII. Unloading and loading were each done pursuant to specific instructions provided by the cargo air carrier, often referred to as the load sheet. Unloading has to be done in a very specific order and is highly dependent upon the cargo. If the unloading was not done in the correct order, it could cause the aircraft to become unbalanced and tip backwards onto the tail of the aircraft, creating an unsafe condition, possibly causing the cargo to shift with resulting damage to the aircraft or cargo.

38.     At the cargo door, one or two cargo ramp agents would move the cargo onto the K-loader, and the K-loader operator would then lower the K-loader's cargo platform. Once the K-loader's cargo platform had been lowered, cargo ramp agents at the bottom of the K-loader would move the cargo from the K-loader to a dolly, usually with the help of a forklift that was operated by yet another cargo ramp agent. For efficiency, each tug towed more than one dolly. When a dolly was fully loaded, the tug driver would maneuver the tug and loaded dolly so that the next attached dolly could be loaded. The process would repeat itself until all of the attached dollies were fully loaded. Because of the close proximity of the tug and dollies to the aircraft, and limited visibility, another cargo ramp agent, sometimes referred to as the "spotter," would watch and guide the tug driver. The tug driver would then drive the tug and its string of loaded dollies to

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1   the air carrier's warehouse and unload the cargo.  When the cargo had been

2   unloaded, he would drive the tug and string of empty dollies back to the aircraft

3   and repeat the process.  There were generally two tugs servicing each of the cargo

4   doors so that as one was leaving for the air carrier's warehouse, the other was

5   moving into position to continue with the unloading.

6       39.    Exhibit 8 to this Declaration is a photo of an aircraft operated by one

7   of the cargo air carriers that Perry was assigned to.  It shows part of the cargo

8   unloading operation on a cargo aircraft shortly after the aircraft had arrived at the

9   cargo ramp.  The aircraft door to the main deck of the aircraft is open and some of

10  the cargo inside the aircraft, secured by netting, can be seen through the open

11  aircraft door.  The K-loader is being positioned or in position at the open cargo

12  door.  A cargo ramp agent is on the bridge of the K-loader, which is where the K-

13  loader operator is stationed in order to operate the K-loader.  The cargo ramp agent

14  identified as "A" on the photo is probably the supervisor or lead and is doing a

15  walk-around to inspect the exterior of the aircraft.  The individual identified as "B"

16  on the photo is not a cargo ramp agent.  The cargo ramp agent identified as "C" on

17  the photo is sitting on a tug connected to a string of dollies, waiting for the cargo to

18  be unloaded from the aircraft.  Cargo ramp agent "C" will pull the tug and dollies

19  up to the lowered K-loader cargo platform and move the cargo from the K-loader

20  cargo platform to the dolly next in order to be loaded.  The two cargo ramp agents

21  collectively identified as "D" on the photo are connecting the tail stand to the tail

22  of the aircraft.  The cargo ramp agent identified as "E" on the photo is at the

23  bottom of the K-loader; this employee might have marshaled the aircraft in and

24  then guided the K-loader up to the aircraft.

25      40.    Once the unloading of an aircraft was completed, the process would

26  be reversed, i.e., the tugs would hook up to the loaded cargo dollies that had been

27  assembled at the cargo ramp, each dolly was positioned at the bottom of the K-

28  loader, the cargo was transferred onto the K-loader and the K-loader operator

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

raised it to the level of the cargo door, where it was moved onto the aircraft. The cargo ramp agent assigned to operate the aircraft's hydraulic system would maneuver it to the assigned location within the aircraft, and another cargo ramp agent would unload and position it and then lock it into place. Each piece of cargo, based on weight and configuration, was assigned a specific location in the aircraft. The load order and location had to be followed precisely to ensure the stability of the aircraft on the ground and in the air, and each item had to be locked in place or otherwise secured for the same reason.

41.     Once a deck of the aircraft was fully loaded and the cargo locked into place, the ASII cargo ramp agents exit the aircraft, close the cargo door, and remove equipment away from that cargo door.

42.     After the aircraft's cargo doors were closed, one or more ASII cargo ramp agents would again inspect the exterior of the aircraft and report any damage or other irregularity. All ASII equipment and any debris would be removed from the cargo ramp area. The arrival procedures were essentially reversed in order to allow the aircraft to leave the ramp area.

43.     Once the aircraft had vacated the ramp area, there was still work for the ASII cargo ramp agents to do. ASII employees were required to re-park equipment and store things such as wheel chocks, tail stand, and cones. The air carriers typically required the cargo ramp agents to remain at the cargo ramp until the aircraft was actually "wheels up," in the event the aircraft had to return to the ramp for any reason. However, between the time that the aircraft left the cargo ramp and the time it was reported to be "wheels up," there was usually down time for the cargo ramp agents. Once the aircraft was reported to be "wheels up," the cargo ramp agents were usually permitted by contract with the air carrier to get in the van and their supervisor would drive them to the ASII Operations office where they would clock out.

44.     After the cargo ramp agent crew was driven back to the ASII

1  Operations office, any cargo ramp agent not assigned to another flight, had
2  completed his work, and didn't have anything to do, had the option of punching
3  out and leaving, or waiting around to punch out at the end of the scheduled period
4  for their crew. A cargo ramp agent who waited to punch out at the end of the
5  period could engage in personal activities because he was not assigned to do any
6  work. A cargo ramp agent who was scheduled to work two flights on the same day
7  would typically punch out for a break and punch back in when they returned to
8  work the second flight.

9

10      ***Aspects of ASII's Cargo Ramp Agents and Operations and the***
11      ***Extensive Nature of Cargo Air Carrier Control Over ASII Cargo***
12      ***Ramp Agents***

13      45.      Cargo air carriers typically fly large cargo aircraft ("wide-body"
14  aircraft). The majority of international cargo air carrier flights are not on time. In
15  some instances, there is a charter "ad hoc" flight to handle the air carrier's
16  customer's unique needs which makes arrivals of flights very unpredictable. If the
17  cargo air carrier had to maintain its own trained ground handling crew, it would be
18  very expensive for the carrier. Due to the work, there is significant turnover, so it
19  would be hard for the carrier to maintain a cargo ramp agent crew. ASII can
20  leverage its existing human resources, recruiting and training staff, and other
21  administrative staff to support multiple air carriers, resulting in only a pro rata cost
22  allocated to each cargo air carrier. ASII also used the same equipment and
23  equipment maintenance employees to support multiple air carriers, resulting in
24  reduced costs to each carrier. Similarly, to the extent that a cargo ramp agent was
25  trained and certified for and could be assigned to more than one cargo air carrier
26  account, the cargo air carriers benefited from reduced labor costs.

27

28

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

*Staffing, Scheduling, Hiring, Training, Discipline, and Supervisory Authority of the Cargo Air Carriers*

46.    In addition to specific contractual provisions regarding staffing levels that influenced how many and what types of cargo ramp agents ASII had in Department 145 at any given point, cargo air carriers could and did direct ASII that it wanted a specific cargo ramp agent assigned to a specific task or in a specific area.

47.    ASII had to carefully analyze the number of employees it hired for each position, the hours required, and staffing for each shift, taking into consideration the staffing and service levels required by specific air carrier customers. There were times, however, that a cargo air carrier directed ASII to assign more employees to service the air carrier. Similarly, there were times that a cargo air carrier requested lower staffing levels because the air carrier did not want to incur additional costs.

48.    As is evident from the preceding description of the cargo ramp service and operations, and the contracts between ASII and its cargo air carrier customers discussed in more detail below, staffing and scheduling of ASII's Department 145 cargo ramp agents was often very specifically dictated by its air carrier customers and their requirements. Even when a contract did not specify staffing and scheduling, ASII's air carrier customers' flights and cargo dictated both the timing of ASII's employees' shifts and the number of ASII employees assigned to a particular shift. For example, if a carrier added, canceled, or changed a flight, or changed the type of aircraft on a flight, the scheduling and staffing of cargo ramp agents in Department 145 was directly affected.

49.    Every cargo air carrier required ASII to provide timely cargo ramp services without any delay attributable to ASII. This was true even if there was a difference between the ETA that ASII had been given and the ATA of the aircraft. This was also true notwithstanding problems that ASII might have with its

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

CV13-00059-SVW (AGRx)
DECLARATION OF GUILLERMO MARRON

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

equipment or cargo ramp agents, or difficulties that the cargo ramp agents might encounter with the cargo. Depending on each air carrier contract, ASII was subject to financial penalties depending on the length of any delays attributed to ASII. Some contracts allowed the air carrier customer to refuse to pay ASII for delayed flights.

50. ASII needed to be extremely aware of three factors, i.e., delays, the individual's training, and air carrier customers' needs.

51. As a result, ASII regularly communicated with each of its cargo air carrier customers the need to review and discuss staffing levels and to address delays.

52. Delays, whether or not attributable to ASII, had a significant impact on the schedules of ASII cargo ramp agents in Department 145. If an incoming flight or an aircraft on the ground was delayed for any reason, ASII employees who were scheduled to provide cargo ramp services to that aircraft would be held over beyond their scheduled shift with little or no advance notice.

53. Cargo air carriers required ASII cargo ramp agents assigned to work on any given flight to be fully trained on both air carrier procedures and the specific type of aircraft used on that flight.

54. ASII had to maintain records of and provide proof of each cargo ramp agent's training upon request by the cargo air carrier. Cargo air carriers typically required ASII employees to undergo initial training specified by the air carrier. A majority of the carriers used a "train the trainer" type of program in which the air carrier itself trained one or two ASII cargo ramp employees to be trainers who were then allowed to train other ASII cargo ramp agents. These "train the trainer" programs sometimes required the ASII "trainers" to travel to a specified carrier facility for concentrated training by the carrier. After completion of the training, these cargo air carriers certified the ASII employee as a designated trainer for that air carrier. ASII contracts that included this program required subsequent training

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1  of other ASII employees assigned to that air carrier to be conducted by the air

2  carrier's certified trainer.  Each cargo air carrier's training, whether done directly

3  by the air carrier or through a "train the trainer" program, was specific to cargo

4  ramp agents, the type of aircraft, and the air carrier.

5      55.     When a new cargo ramp agent was hired, he/she was given the

6  training that was required by the air carrier customer to whom the agent would be

7  assigned.  Most cargo carriers did not accept training provided by another carrier.

8  In addition to carrier-required training, a new ASII cargo ramp agent in

9  Department 145 was given ASII classroom training covering basic topics like ramp

10  safety, how to precheck and operate various pieces of equipment, and what the

11  different kinds of equipment were used for.

12      56.     When an air carrier began using a new model of aircraft, ASII cargo

13  ramp agents assigned to that new model aircraft had to first receive training from

14  the air carrier.  Some cargo air carriers required ASII to update them periodically

15  on which employees were authorized to service their aircraft.  ASII attempted to

16  train each cargo ramp agent in more than one air carrier and more than one kind of

17  aircraft model to make the cargo ramp agent more flexible in assignments.  That

18  was not always successful.

19      57.     Some of ASII's cargo air carrier customers also included a

20  requirement that ASII employees take and pass tests on various aspects of the air

21  carrier's operations, such as the handling of hazardous substances or live animals.

22  ASII was required to keep the test results on file and make them available for

23  review by the air carrier upon demand or during an audit.

24      58.     Each cargo air carrier could, and most did, require ASII employees

25  assigned to the customer's contract to receive recurrent training on a periodic basis

26  that was specific to that carrier.  Most cargo air carriers required ASII to provide a

27  list of employees who successfully completed that training.  The air carriers

28  decided when recurrent training was required, as well as the nature of that training.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

59.     Most cargo air carriers also provided ASII with "service bulletins" which identified changes in procedures or requirements being imposed by that air carrier.

60.     Most cargo air carriers also had a set of manuals that provided procedures and requirements that ASII employees had to follow with respect to that air carrier. The manuals outlined procedures and specifications for such things as loading and unloading of cargo. Generally, contracts that ASII had with its air carrier customer required ASII to operate in compliance with their manuals or risk consequences, such as fines imposed by the FAA. Contracts typically authorized the air carrier to terminate its agreement with ASII if the carrier believed ASII was not in compliance with its specified procedures, particularly with respect to safety.

61.     ASII had to update its carrier-specific manuals with the latest air carrier revisions provided by the carrier. Air carrier customers expected and required ASII to keep current with all FAA and carrier-issued revisions, directives, and alerts regarding updates, amendments, or modifications of the manuals.

62.     In addition to the manuals and bulletins, air carriers also verbally instructed ASII employees to follow certain procedures, which may have been different than the procedures of other air carrier customers.

63.     Furthermore, the different types of cargo ramp agent duties required different levels of experience and expertise. A new cargo ramp agent usually began his/her employment operating tugs with dollies between the air carrier's warehouse and the cargo ramp prior to the arrival of the aircraft, thereafter, working in the bulk cargo compartment. These two duties required the least amount of experience and expertise. From there, the cargo ramp agent might start to work inside the aircraft on the cargo decks with cargo locks. Forklift drivers required more experience and expertise and had to be certified to operate the forklift. The push-back operator required even more experience and expertise than the forklift driver. The K-loader operator required more experience and expertise,

and the main control panel operator had specialized skills.  The lead and supervisor had to be able to do all of the various aspects of the operation so they could take over or assist as needed.

64.     Due to aircraft-type and air carrier-specific requirements, cargo ramp agents were often not interchangeable because they did not always have the necessary training.  Thus, for example: (a) a cargo ramp agent who was trained and certified for one aspect of cargo ramp operations may not have been trained and certified for another aspect; (b) a cargo ramp agent who was trained for one type of aircraft may not have been trained and certified for another type of aircraft; and (c) a cargo ramp agent who was trained by one air carrier may not have been trained by another air carrier.

65.     Furthermore, once a crew received the specific flight instructions at the beginning of a shift, it was very difficult to move a cargo ramp agent from one flight to another because a ramp agent moved to a crew after those instructions would have missed that information.  I recall one instance when ASII tried to bring in another agent part-way though the unloading and loading process on a flight. The crew had temporarily moved pallets, which were supposed to remain on the aircraft, to the back of the aircraft to get them out of the way.  The newly-assigned cargo ramp agent left them there and the plane continued to be loaded.  Those pallets were thus left in the wrong place.  ASII had to unload and reload approximately half of the aircraft to correct this.

66.     Cargo air carrier customers had the ability to, and did, cause an ASII cargo ramp agent to be disciplined or removed from the air carrier's account.

67.     Air carrier customers could, and did, report unsatisfactory performance by individual ASII employees.  Air carrier complaints about the performance or conduct of ASII employees could result in disciplinary action against the identified employees.

68.     ASII employees could and were disciplined for a violation of an air

57381 Marron Decl.-r13 .docx

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

carrier's rules and regulations, or airport authority rules and regulations. Depending on the nature of the violation, the employee could receive a verbal warning, a written warning, a suspension, or be terminated.

69.    The 2010 and 2013 CBAs each specifically state in Article 9 that an employee could be terminated if a cargo air carrier customer refused to allow the cargo ramp agent to work on their aircraft.

70.    ASII removed Department 145 cargo ramp agents from an account at the request of a cargo air carrier customer at LAX.  For example:

- in 2013, Asiana (an ASII customer) requested that a cargo ramp agent named XXXX be removed from its contract and not work on any of its flights due to an incident commonly called a "near miss" that XXXX was involved in.  In that incident, XXXX almost ran over an Asiana representative while operating a forklift.  Pursuant to Asiana's request, XXXX was not only removed from that contract but was given a final warning and suspended for that near miss incident; and

- in late 2012 or early 2013, Asiana requested that a lead cargo ramp agent, YYYY, be removed from its contract and not work on any of its flights due to a flight delay that Asiana attributed to this employee. YYYY was the lead on the cargo ramp agent loading and unloading activities when the piece of equipment called a cargo loader broke down.  She was removed from the contract pursuant to Asiana's request.

71.    On another occasion, an ASII cargo ramp agent drove a vehicle under the wing of a cargo air carrier's aircraft, causing damage to the aircraft.  The damage grounded the flight for almost a day.  The cargo air carrier was understandably upset about this.  The employee was terminated.

72.    Air carrier complaints about the performance of ASII employees noted during the audit process have also resulted in disciplinary action against

CV13-00059-SVW (AGRx)
DECLARATION OF GUILLERMO MARRON

1  those employees.  ASII takes appropriate action as the result of problems identified

2  during an air carrier audit.  For example, during an audit one cargo air carrier noted

3  that an ASII cargo ramp agent had "parked" a loader on the aircraft without a guide

4  person present.  As the result, the employee was disciplined.

5      73.    There have been instances in which an ASII employee was accused by

6  the air carrier of damaging air carrier equipment, property, or aircraft.  When an air

7  carrier complained to ASII about such an incident, ASII investigated and took

8  appropriate action with respect to the involved employee(s).  Where an ASII

9  employee was not accused of damaging property or causing personal injury, air

10  carriers still have reported observations of improper conduct by ASII employees,

11  such as not wearing a safety vest.  In such an event ASII investigated and took

12  appropriate action with respect to the involved employee(s).

13

14    ***Regular Interaction Between Cargo Ramp Agents and Cargo  Air***

15    ***Carrier Personnel During Operations***

16      74.    Cargo ramp agents in Department 145 interacted with cargo air carrier

17  employees on a regular basis in addition to the instances described in the preceding

18  paragraphs.  For example, cargo ramp agents marshaling a plane in or out,

19  performing an aircraft tow-in or a pushback, or who were positioning equipment

20  up to and in some cases connecting it with the aircraft were in regular

21  communication with the carrier's plane-side representative and sometimes directly

22  with the pilot.  The crew supervisor or lead also regularly communicated with the

23  plane-side representative during the handling of the flight.  They passed along

24  information to the cargo ramp agents as needed.  An air carrier's pilot or plane-side

25  representative could verbally instruct the cargo ramp agents regarding various

26  aspects of the operation, particularly the positioning of equipment around the

27  aircraft or attaching equipment to the aircraft.

28

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

57381 Marron Decl -r13 .docx

23

75.     ASII was responsible to visually inspect the cargo that was transferred to or from the air carrier's on-airport warehouse and that was unloaded or loaded into the aircraft.  If any damage were seen, air carrier personnel would be notified.

### *ASII Attendance at Carrier Meetings and Air Carrier Audits*

76.     I and other ASII representatives regularly attended meetings with cargo air carriers' station managers and airport personnel.  The frequency and nature of the meetings varied depending on the cargo air carrier and the issues needed to be addressed.  ASII representatives also participated with cargo air carriers on joint safety committees.  These and other meetings addressed many different issues of importance to the services that the air carriers provided, e.g., air carrier's procedures; operational issues such as the positioning of belt loaders when loading or unloading cargo, ensuring that aircraft and vehicles were properly parked, chocked, and attended; staffing levels, and similar issues.

77.     Cargo air carriers monitored ASII's performance in many ways, including their audits.  These audits were often unannounced.  Some cargo air carriers conducted at least one yearly audit, and some were done on a random basis.  These audits might include safety audits, and audits for compliance with the carrier's service and training manuals.  Some audits included the observation of ASII employees performing their job duties.  In some instances ASII employees were questioned by the air carrier as part of the audit.  The air carriers would also ensure that ASII had up-to-date and complete air carrier-specific operations manuals.  During these audits, the cargo air carrier typically examined ASII equipment, employee training, employee performance, and other aspects of ASII's services.  After receiving the written audit report, ASII was expected to respond quickly to any concerns with a corrective action plan.  Corrective measures could include retraining or discipline of ASII cargo ramp agents.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

*Overview of Sample Contracts Between ASII and Cargo Air*
*Carriers at LAX*

78.    I am generally familiar with the contracts between ASII and its cargo air carrier customers at LAX that were performed by Department 145 cargo ramp agents.  The contracts typically contained provisions that covered similar topics, although each carrier could impose its own very specific requirements that impacted ASII's operations and ASII's employees.  The specific contracts that are discussed below were, in some instances, just for cargo services performed by cargo ramp agents in Department 145 at LAX.  In other instances, they were for cargo services performed by employees in Department 145 plus services performed by ASII employees in other departments.  In each instance described below, the customer was an international cargo air carrier that had flights to and from LAX.  For the purpose of protecting confidential and trade secret information of both ASII and the particular cargo air carrier, I am using customer numbers, not the name of the cargo air carrier.  Each of the provisions described applied to Department 145 cargo ramp agents.

A.    <u>Customer 1</u>

ASII had a ground handling contract with cargo air carrier Customer 1 from July 2000 through 2011.  This air carrier is a global airfreight carrier that provides cargo transport on an ad hoc "charter" basis.  This contract, among other things, specified:

- that the air carrier would provide initial and recurrent training to ASII employees on weight and balance procedures;
- ground handling and reporting procedures;
- the hourly rates paid to ASII per assigned employee; and
- that the air *carrier's aircraft had to be serviced within specified ground times in order to avoid delays*.

ASII renegotiated the agreement with this air carrier.  Under the new agreement, effective from July 2011 through June 30, 2013, which covered both air carrier Customer 2 below and this air carrier, many of the same contractual obligations were continued.

**B.    Customer 2**

ASII had a ground handling agreement with cargo air carrier Customer 2 from July 2006 through 2012.  This air carrier is an international air carrier that transports cargo.  This contract, among other things, specified that:

- ASII was the only designated handling agent for the carrier's flights;
- ASII was paid on a "per flight handled" basis;
- there was a *specific limit on the aircraft's ground time and thus a limited time ASII employees could spend unloading and loading cargo*.  This carrier had a very tight window of operations of only 1.5 hours to offload and load the aircraft.  ASII's performance had to be nearly perfect;
- any ASII employee assigned to this account had to first have initial and recurrent training provided by the air carrier on procedures and new aircraft models;
- ASII employees could not take any action without direct technical instruction from the air carrier; and
- The carrier was not responsible for delays due to a lack of technical instruction.

ASII renegotiated the agreement with this cargo air carrier.  Under the new agreement, effective from July 2011 through June 30, 2013, and which covered both air carrier Customer 1 above and this air carrier, these terms generally were the same.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

C.   **Customer 3**

ASII had a ground handling agreement with cargo air carrier Customer 3 that was effective from July 2005 through November 30, 2008. This air carrier transports cargo, including pharmaceutical products, live animals, dangerous goods, and other cargo. Among other things, this agreement:

- *required ASII to use its "best effort" to ensure that no matter when the aircraft arrived, the aircraft's departure schedule would be maintained whenever possible;*

- specified that at the start of service, the air carrier would provide initial orientation and training to ASII's employees assigned to this account;

- included a service level agreement provision indicating the percentage of time during which ASII's employees and equipment had to be ready compared to the ETA (for most aspects of ASII's cargo handling) and ATA (for most aspects) arrival time of the aircraft, including a *requirement that cargo unloading be completed within 55 minutes of the ATA, and that the last unit of outbound cargo reach the aircraft 85 minutes before the estimated departure time of the aircraft;*

- set times for the delivery of certain cargo, mail, and other items;

- required ASII to abide by notices or circulars issued by the air carrier related to the services;

- required ASII to update any of its own procedures to comply with the air carrier's procedures including any updates; and

- required ASII to have 100% compliance with the aircraft's scheduled departure time, i.e., ASII could not be responsible for any delay to the aircraft's departure due to such things as damage to the aircraft, mishandling of cargo, a loading discrepancy, or a lack of manpower or equipment.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

CV13-00059-SVW (AGRx)
DECLARATION OF GUILLERMO MARRON

### D.   Customer 4

ASII had a ground handling agreement with cargo air carrier Customer 4 from November 2005 through November 2008. This air carrier is an international cargo air carrier. It shared some similarities with the above cargo air carrier, but this carrier's aircraft arrived and stayed on the ground for approximately five or six hours. This agreement, among other things:

- set staffing levels for ASII both with respect to the number of supervisors and cargo ramp agents for three different kinds of flights and schedules;
- set specific ground time limitations that ASII had to comply with;
- required ASII employees assigned to this account to have training based upon the air carrier's Standard Handling Procedures, allowed the air carrier to inspect the training files of ASII employees assigned to this account, and required ASII to provide supplemental training to its employees within 30 days of any notice of procedural changes by the air carrier; and
- prohibited ASII from taking any action without technical instruction from the air carrier.

ASII negotiated a new agreement with this cargo air carrier effective from May 2009 through April 2012. The new agreement, among other things, continued many of the provisions of the prior agreement. It also included requirements for ASII staffing of operations for the previous kinds of flights with the addition of specific staffing for a B-747 RON flight (two 3-hour windows of operation).

ASII negotiated a third agreement with this cargo air carrier that was effective from August 2012 through July 2015. Under this agreement, the prior terms were generally continued. Although this third agreement covered services through 2015, ASII closed down Department 145 in November 2013, as noted earlier, and notified this air carrier customer that it would no longer provide those services.

28

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

**E.    Customer 5**

ASII had a ground handling agreement with cargo air carrier Customer 5 that became effective in September 2007 and included cargo handling services. This cargo air carrier transports cargo internationally, including cargo that is particularly time-sensitive or otherwise requires special treatment such as perishables, pharmaceuticals, live animals, and dangerous goods.  It had a variable schedule.  Among other things, this agreement:

- had a "train the trainer" provision, reserved to the air carrier the right to certify ASII's training program, and gave the air carrier the right to inspect the training files of ASII employees providing services to the air carrier under the agreement;
- required ASII to do background and driving checks on any employee assigned to the account, and reserved to the air carrier the right to perform background checks on any ASII employee assigned to the account;
- required ASII to have and comply with the air carrier's Ground Operations Manual and reserved the air carrier's right to determine that ASII employees required additional training;
- required ASII to provide the air carrier with the list of personnel handling the contract.  If there were any change to the assigned personnel, ASII had to notify the air carrier of the change, including prompt reporting of all terminations and resignations of ASII employees assigned to the account;
- set the number of ASII employees required for each type of operation, and the kinds of ASII personnel to handle each cargo flight;
- the service level agreement had a number of provisions, including specified windows of operation for the various kinds of flights that it operated which could be as short as 1.10 hours to unload and load the

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

aircraft, and target times for various aspects of the cargo handling operation;

- imposed stringent penalties on ASII for delaying an aircraft by even as little as 10 minutes;
- provided the air carrier would not pay anything extra for flights operating within 90 minutes of the scheduled arrival or 60 minutes of the scheduled departure. (In my opinion, this provision reflects the fact that it was very common for this air carrier's cargo flights to be up to 90 minutes later than the scheduled arrival time, and thus placed pressure on ASII to turn the aircraft quickly so that the flight was still within 60 minutes of the scheduled departure); and
- ASII and any employee assigned to this air carrier had to perform all cargo handling services, including Dangerous Goods ("D/G") handling, as per FAA, Department of Transportation ("DOT"), Customs and Border Protection ("CBP"), Transportation Security Administration ("TSA"), and other applicable regulations and provide the air carrier upon request with copies of all documents related to these activities.

In November 2011, ASII renegotiated the agreement to be effective through October 2013. Among other things, the new agreement continued these same general requirements and required ASII to pay specified penalties for any delay attributable to ASII.

**F.   <u>Customer 6</u>**

ASII had a ground handling agreement with cargo air carrier Customer 6 from January 2008 through January 2010. This air carrier uses its fleet of aircraft to specifically transport cargo internationally, including valuable cargo such as precious art, dangerous goods, live animals, perishable cargo, pharmaceuticals, and other kinds of cargo. Among other things, this agreement:

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

- *set delivery standards for certain types of cargo, e.g., the first unit of cargo as well as urgent shipments (e.g., live animals and perishables) had to be unloaded and delivered to the air carrier's on-airport warehouse within 30 minutes of the aircraft's ATA, and the last unit of cargo had to be unloaded and delivered to that warehouse within 90 minutes;*
- described specific training requirements for ASII employees assigned to this account and gave the air carrier the right to inspect training records of ASII employees assigned to this account;
- gave the carrier the right to inspect equipment maintenance records of equipment used by ASII on this account;
- required ASII to conduct self-audits using the air carrier's checklist; and
- *required that all unloading and servicing of the aircraft be completed 5 minutes prior to the scheduled departure time, with stringent penalties for any delay caused by ASII of over 15 minutes.*

ASII renegotiated the agreement with this cargo air carrier that was effective from January 2010 through December 2012.  The new agreement, among other things, included:

- specific rates for ASII employees for off-schedule operations;
- a 4-hour ground time limitation;
- a staffing level agreement with specific time requirements for specific activities and delay fees; and
- a requirement that ASII employees follow specified service standards and handling standards.

## G.    Customer 7

ASII had a cargo ground handling agreement with cargo air carrier Customer 7 from July 2012 through July 2017.  This agreement covered the cargo ramp agent

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

services that ASII provided to the cargo air transport portion of this air carrier's services. Among other things, this air carrier provides the air transport of cargo internationally, including perishable, dangerous, live animal, pharmaceutical and special cargo (e.g., cargo that has special needs such as specific air temperatures, or that is very valuable). Among other things, this agreement required ASII to:

- assign a dedicated ASII supervisor for each shift who had to be present at the aircraft during its entire ground time;
- assign at least one ASII employee to each flight (preferably the supervisor) who had valid cargo ramp agent training specific to the aircraft type as further detailed by the air carrier;
- follow a service level agreement that contained a carrier-required training matrix for ASII employees assigned to this account;
- follow the air carrier's Cargo Security Manual, Ground Operations Manual, and Cargo Handling Manual as well as any updates or changes to these manuals issued by the air carrier;
- meet timing requirements and imposed penalties against ASII for delays attributable to ASII, e.g., all loading had to be completed and all doors closed no later than 5 minutes before the scheduled time of departure/estimated time of departure unless the air carrier delayed the aircraft; imposed stringent penalties on ASII for delays by ASII of as little as up to 15 minutes.

Although this agreement covered services through 2017, when ASII decided that it could no longer maintain what it deemed to be an acceptable profit margin providing cargo ramp agent services, it invoked the notice provision of the agreement and notified this air carrier customer that it would no longer provide those services after November 2013.

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

32

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

**H.   Customer 8**

ASII had a cargo ground handling agreement with cargo air carrier Customer 8 effective from August 2012 through July 2015.  This is an international air carrier that handles cargo.  Under this agreement:

- there was a service level agreement pursuant to which (a) ASII was charged a certain percentage of its ramp handling charge for delays attributable to it for as little as 15 minutes, (b) ASII's charge was reduced by 5% for each incorrectly loaded item of cargo, and (c) specified the number of ramp agents and supervisors for each flight and the timing of services; and
- ASII employees were required to take direction from the air carrier regarding loading instructions.

Although this agreement covered services through 2015, when ASII decided that it could no longer maintain what it deemed to be an acceptable profit margin providing cargo ramp agent services, it invoked the notice provision of the agreement and notified this air carrier customer that it would no longer provide those services after November 2013.

**I.   Customer 9**

ASII had a ground handling agreement with cargo air carrier Customer 9 from January 2000 through 2012.  This air carrier is an international cargo airline.  Among other things, this agreement:

- established ad hoc labor rates for ASII's cargo ramp agents;
- set ASII time requirements and staffing depending on the type of aircraft and flight;
- specifically stated that *each aircraft had to be unloaded and/or loaded and serviced within the scheduled ground time* so as to not incur a delay to the operating schedules of any aircraft;

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1
2
3

- provided that the air carrier would coordinate the training of ASII employees, and required ASII to maintain and provide training records of employees assigned to this account; and

4
5

- required ASII to ensure that all employees assigned to this account go through FAA and LAX background and security checks.

6

7    **J.    Customer 10**

8    ASII had a ground handling agreement with cargo air carrier Customer 10

9   from October 2007 to July 2012.  This air carrier was an all-cargo air carrier.  The

10   agreement, among other things:

11
12

- designated a 4-hour labor window, unless the flight was a RON flight. RON flights were designated as having two 3-hour windows; and

13

- contained a "train the trainer" program.

14

15   **K.    Customer 11**

16   ASII had a ground handling agreement with cargo air carrier Customer 11

17   that included cargo ground handling services at LAX from January 2002 through

18   2010.  This air carrier is an international and domestic air carrier that provides both

19   ad hoc "charter" and more regularly-scheduled cargo transportation.  At LAX,

20   Department 145 provided cargo ramp services to this carrier for flights to and from

21   LAX and the carrier's domestic hub.  Except for its occasional ad hoc flights, this

22   carrier had one of the most predictable and regular flight schedules.  This carrier

23   trucked cargo to the ramp and ASII offloaded it at the aircraft's side.  This

24   typically took about an hour, depending on how quickly the carrier trucked the

25   cargo to the ramp.  The aircraft typically arrived in the morning and remained at

26   the ramp during the day.  ASII had a 3-hour window of operation to unload the

27   aircraft.  It generally took approximately one hour to unload the aircraft, depending

28   on the cargo.  After the aircraft was unloaded, ASII only needed two forklift

drivers and a supervisor or lead to transfer the unloaded cargo onto the dollies. When the cargo ramp agent crew assigned to the flight in the morning finished, most of the agents would punch out and go home since they were paid a minimum of 3 hours; a few would punch out for a break of approximately one hour if they were assigned to another flight. The aircraft was usually scheduled to depart at approximately 7:30 p.m. Therefore, ASII typically had a second crew scheduled from 5:00 to 8:00 p.m. to load the aircraft since again there was a 3-hour window of operation; loading typically took about an hour at the most. This agreement had extensive and very detailed requirements, for example:

- the services to be provided either planeside or at an on-airport facility of the air carrier included cargo weighing, loading and unloading of aircraft and trucks, aircraft towing and marshaling, load planning, movement of cargo and equipment to and from the aircraft, sorting of packages and buildup and breakdown of cargo, tie-down and restraint of cargo, cleanup of aircraft ramp, and any other activity that supported the air carrier's aircraft operation and cargo handling;

- set-up, unloading/loading, and wrap-up windows of operations and the ASII crew was not allowed to leave the ramp until the aircraft was "wheels up;"

- if the carrier brought in a flight that was not fully loaded (which could be one of the more-regularly scheduled flights or an extra flight), ASII would "top off" the aircraft with additional cargo;

- when ASII performed labor outside of the operations window (or an extended operations window) and the delay was within ASII's control (e.g., equipment failure, or aircraft reloading due to it being incorrectly loaded), ASII was not paid for that time;

- occasionally, due to bad weather or an inoperable aircraft, if the air carrier was able to cancel services for any flight with 3 hours' verbal or

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

written notice to ASII, ASII was not paid for any labor expenses it had incurred;

- all ASII employees assigned to this air carrier were required to have background checks, FAA criminal history search, prior employment reference checks, a 5-panel controlled substances and alcohol testing, and a customs seal because the cargo often went through customs;

- the air carrier reserved the right to search all of ASII's employees who were assigned to work on this account and to conduct investigations and audits of ASII's personnel records (including training files) and equipment files without notice;

- established the number and kinds of ASII employees that were assigned to this account and the amount of time that each group would be allowed to work on this account, e.g., all marshaling had to be done by a primary marshaler as well as two wing walkers (who walk under the wings on each side of the aircraft to ensure that the wings do not contact anything);

- provided for certain payments to ASII based upon the ASII employee's job title;

- included detailed specifications of the ASII equipment and its capability and positioning vis-à-vis the aircraft;

- required all aircraft towing and pushback to be done in accordance with the air carrier's Aircraft Ground Services Manual or its policies and procedures;

- specified the timing and staffing of each of the aspects of the unload and load operation, e.g., for unloading and loading the main deck, *it specified the average number of seconds per ULD* (unit load device) ranging from 60-69 with 68 seconds/ULD for a DC stretch load, and further specified the equipment and staffing for this operation; and

- specified that the minimum *on-time operation of ASII's cargo ramp*

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

*service was 99.1% (i.e., for every 100 aircraft*, ASII had to meet the air carrier's operations window for over 99 of them, essentially meaning ASII had to have almost flawless performance).

### *Opportunities for and Limitations on Cargo Ramp Agent Break Times*

79.    As described above there were typically numerous opportunities for "down time" during which any given cargo ramp agent might have been able to take a 10-minute rest break.  The primary times that these occurred were (a) if a flight was delayed for any significant amount of time, there would be "down time" before the cargo ramp agents even left the ASII Operations office; (b) after the ramp was prepared and before the aircraft actually arrived at the ramp; (c) during the unloading and loading, when there was nothing specific for the ramp agent to do; (d) after the aircraft left the ramp but before it was "wheels up;" and (e) after the aircraft was "wheels up" and the cargo ramp agents had returned to the ASII Operations office but before an individual cargo ramp agent clocked out.

80.    Cargo ramp agents could use this time for their 10-minute rest breaks. They were free to use this time for personal activities, such as personal conversations, eating, going to get something to eat at a vending machine, using the restroom, or reading.  They were not allowed to use cellular telephones on the ramp when the assigned aircraft was on the ground.  However, if the aircraft had not yet landed (or it had departed at the end of the process) they could use a cellular phone as long as they were not operating a piece of equipment.  Absent any specific work assignment, they could also leave the ramp to make or receive a cellular telephone call.  I saw many employees doing all of these kinds of things during these periods of time.  If they were at the ASII's Operations office either because an incoming flight was delayed or after a flight was "wheels up," and since they were not on the ramp, they were free to, and did, smoke, wear

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

headphones to listen to music or use cellular telephones for personal calls in addition to other personal activities such as talking, eating, reading, using the restroom, etc.  There were break areas both inside and outside the ASII Operations office.  In both locations, cargo ramp agents could stand or sit at tables.  In addition, they could go to the parking lot area or the equipment parking area that is adjacent to the ASII Operations office to take a break.  There are restrooms they could use in the ASII Operations office as well as in the fueling area.

81.     There was also at least one catering truck that came by the ASII Operations office.  I saw Department 145 cargo ramp agents buy things to eat or drink from the catering truck while they were "on the clock" but not actively working either before they left for the ramp or after they returned.  I know that the cargo ramp agents ate or drank while on the ramp as well, because I saw food wrappers, bags, soda cans, and similar things in the vehicles they used on the ramp area.

82.     Based on my observations and knowledge of the cargo operations, I believe that every Department 145 cargo ramp agent was almost always provided with the opportunity to take at least one 10-minute rest break every 3.5 hour.

83.     ASII preferred that cargo ramp agents use the restroom before or after they were positioned at the ramp.  If a cargo ramp agent needed to use the restroom while he/she was on the ramp, either the cargo ramp agent or another employee would drive him/her to the ASII Operations office and back.  Use of a restroom could have been part of a cargo ramp agent's rest break or separate from it.

84.     Meal breaks were harder for ASII to guarantee, due to the unpredictability of the cargo flights, the length of the meal break (30 minutes), the often limited ability of the employee to leave the work area, the meal break timing requirement, and the nature of the work at the ramp.

85.     Nevertheless, I observed some cargo ramp agents clocking in and out for meal breaks and engaging in personal activities consistent with being on a meal

break, such as the activities described above in connection with rest breaks.

86.   As noted above, ASII generally had a 3 or 4 hour operations window per flight.  If everything worked smoothly and the flight was on time, the cargo ramp agents could take a meal break after the flight left.  However, the unpredictability associated with cargo flights meant that in many instances the shift was extended past the 5-hour mark.  This would often become necessary after the crew reported to work and with little or no advance notice.  Furthermore, if the cargo ramp agent shift was unpredictably extended to 5 hours for some reason, the time limit by which a meal break had to be taken would almost always have occurred when the cargo ramp crew was occupied with unloading and loading an aircraft.  If one or more cargo ramp agent stopped work to take a 30-minute meal break it would have delayed the flight with adverse consequences described previously.

87.   If ASII was given sufficient advance notice once a crew had started their shift that the flight was going to be delayed by at least 30 minutes, the cargo ramp agents could take their meal break before the aircraft arrived.  However, ASII did not always get sufficient advance notice from carriers.

88.   There were many reasons why a crew that was anticipated to, and scheduled to, work either a 3-hour or 4-hour flight would end up working more than 5 hours.  All of the reasons for a shift to unpredictably extend to more than 5 hours simply cannot be described.  However, here are some reasons:

(a)   Even when ASII was given notice of an incoming cargo flight's ETA, there were numerous factors that impacted the hours of work of ASII's cargo ramp agents, such as a weather-related delay or diversion of the aircraft by Air Traffic Control to a remote runway due to weather, airport congestion, runway or gate unavailability.  There were times, for example, that an aircraft was unexpectedly directed to land at a location that was 30-45 minutes taxi time away from the designated cargo gate and ramp.  Although the aircraft had landed, it took that

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1   amount of time to actually reach the cargo gate and ramp for ASII employees to

2   unload and load the cargo.  Without any prior notice to ASII, such an event

3   extended the number of hours to be worked by the ASII cargo ramp agents.  The

4   reverse was also true:  the aircraft may have had to wait at the cargo gate before it

5   could take off due to weather conditions, airport congestion, or runway

6   unavailability.  At least some ASII employees had to stay at the gate until the

7   aircraft was "wheels up."

8       (b)    In many instances, a carrier would, with little or no advance notice to

9   ASII, delay a flight so that high-priority cargo could arrive and be loaded.

10      89.    From the time of the actual touchdown of the aircraft until it was

11  "wheels up," there was often no time for any cargo ramp agent to stop working to

12  take a 30-minute meal break.  This was the result of a myriad of activities to be

13  done during a very short period of time.  ASII generally had between 90 minutes

14  and 2 hours, depending on the cargo air carrier agreement, to complete the

15  unloading and loading of cargo.  If one member of the crew were to take a break, it

16  would stop certain aspects of the process, which in turn would slow down other

17  aspects.  If a supervisor or lead had to operate the control panel inside the plane to

18  allow the operator to take a break, it became a safety issue because there was no

19  one actively acting as a supervisor and coordinator of the overall process.  It was

20  therefore not possible for a cargo ramp agent to stop working for a 30-minute meal

21  break and still have the entire crew of cargo ramp agents finish unloading and

22  loading the aircraft so that aircraft could depart on time.

23      90.    There were a few cargo air carriers that had flights that were close in

24  time and that allowed the same crew to service both.  If the flights were on time

25  and things went smoothly, there was generally sufficient time for the cargo ramp

26  crew assigned to handle both flights to take a meal break between flights.  Mr.

27  Perry, and the cargo ramp crew that he typically worked with, were assigned to

28  provide cargo ramp services to two cargo air carriers that were particularly

57381 Marron Decl -r13 .docx                        40

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

problematic in terms of having time to take a 30-minute meal break. Because each of these two carriers rather regularly had a flight that was close in time to the other's flight, the same crew serviced both. These two flights had ETAs that, absent unanticipated changes to the actual arrival time, allowed sufficient time between flights for the cargo ramp agents to take a meal break between flights. However, it was not unusual for the first flight to be delayed so that it was "wheels up" on departures less than 30 minutes before the ETA and the ATA of the second carrier's flight. Sometimes the second flight arrived early, leaving less than 30 minutes for the cargo ramp agents to stop work and take a 30-minute meal break. I am aware that when there was insufficient time for a meal break, the cargo ramp supervisors and cargo ramp agents were instructed to, and did, turn in a form that reported this so that they would be paid for the missed break.

91.    Although I believe it would have rarely occurred, it was also possible for both flights to be sufficiently delayed that the cargo ramp agent ended up working enough hours to entitle him/her to a second meal break under state law. The same kinds of problems giving a timely and complete first meal break apply to the second meal break.

92.    ASII took all reasonable steps to provide each cargo ramp agent with meal breaks. However, ASII could not "guarantee" that any given cargo ramp agent would be able to stop working and take a complete meal break given the nature of the work, particularly the unpredictability of the flights and the very short turn-around time at the ramp.

93.    A cargo ramp agent who missed a meal break was instructed to complete and sign a log, or exception form, to report that he/she did not get that break. The supervisor initialed the form if the information was correct, the form was given to payroll, and an agent who did not get a break was paid an extra hour of pay at the agent's regular hourly rate. Payment of these penalties was not covered by the agreement between ASII and the air carrier customer, resulting in

41

increased ASII costs.  Therefore, I instructed the cargo ramp agent supervisors to try to minimize the number of times that the cargo ramp agents did not get a break.  However, it was simply not possible to guarantee that each cargo ramp agent could stop work at specific times to take a break, due to the unpredictability of the operations and the air carriers' needs.

94.     Given the nature of the operations as described above, it was also rarely possible to stagger the meal breaks of the cargo ramp agents.  If one cargo ramp agent stopped work to take a 30-minute meal break, it would slow down the work of the entire team and cause a safety hazard as described above.

95.     At one point, ASII hired "*floaters*" to try to cover cargo ramp agents who were not working for one reason or another, including agents who were on breaks.  It did not work.  The *floaters* simply were not, and could not, as a practical matter be trained to handle all the various jobs for all the aircraft for all the carriers.  Further, when a *floater* was assigned to a crew mid-flight (as would be the case if the *floater* was covering for agents who were on a break), the *floater* was not familiar with the information shared with the crew at the briefing or the flow of that flight's operations up to that point.

96.     ASII staffed its crews to meet air carrier established performance times.  ASII could not require any air carrier to extend turn-around times by 30 minutes to allow the ASII cargo ramp agents to completely stop work at the same time and take a 30-minute meal break.  Similarly, ASII could not allow its cargo ramp agents to stop work on a staggered basis to take a meal break.

97.     Over the years, ASII provided cargo ramp agents with a variety of forms to record times when they did not get a break.  These forms could be used when a cargo ramp agent did not get a break.  Most cargo ramp agents regularly used these forms.  I am not aware of any Department 145 cargo ramp agents who ever reported on a form that they were not provided with a rest break.  If a cargo ramp agent had reported that he was not provided with a rest break, ASII would

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1  have paid that cargo ramp agent an extra hour of pay at the agent's regular hourly

2  rate, just like ASII did for a missed meal break that was reported.

3       98.    True and correct copies of the forms that Mr. Perry turned in reporting

4  that he did not get a meal break are collectively attached to this Declaration as

5  Exhibit 9 and by this reference they are incorporated herein.  I am also aware that

6  Mr. Perry was paid for missed meal breaks that were reported and verified by the

7  cargo ramp supervisor and payroll.  True and correct copies of Mr. Perry's wage

8  information are collectively attached to this Declaration as Exhibit 10 and by this

9  reference they are incorporated herein.  The account code "MISMP" and

10  description "Missed Meal Per" indicates that a one-hour penalty was paid.

11  Sometimes more than one penalty was paid per pay period, which is shown by

12  numbers greater than "1" in the "Hours Unit" column to the right of the penalty

13  notation.  I have also seen such entries in the Kronos reports for cargo ramp agents.

14       99.    The forms to be used by cargo ramp agents to report a missed break

15  was in a notebook in the dispatch office by the time clock, easily available to all

16  cargo ramp agents.  I never observed the notebook not at its usual place, or that it

17  was empty.  Given the kinds of things that cargo ramp agents have complained to

18  me about, questioned me about, or brought to my attention, I believe that if a cargo

19  ramp agent did not get a break and could not find the form to report it on, I would

20  have heard about it.  On one occasion, a cargo ramp agent complained to me that

21  he did not get a break and there was no form.  When I asked why he did not use the

22  form in the dispatch office, he said the supervisor for that flight wanted all the

23  agents to report a missed break on the same page.  I had him fill out a form and

24  told him that in the future he needed to fill one out on a daily basis if he missed a

25  break, even if it was not the way that supervisor liked it.  There were several times

26  that a cargo ramp agent complained to me when he got his paycheck that he had

27  not had a meal break but that his paycheck did not reflect a penalty payment.  I

28  would give him a form to fill out and also investigate it to see if the claim seemed

to be true.  If it seemed to be true, I approved the penalty payment of one hour.  On these occasions, I also reminded the cargo ramp agent that it was important to do this on a daily basis so that ASII could verify it.

100.   In addition, the supervisors typically carried a clipboard with a blank form that cargo ramp agents could fill out "on the spot" and be verified by the supervisor.  Any cargo ramp agent who forgot to fill it out could also fill it out the next workday and turn it in.

101.   There are several provisions in both of the CBAs that govern the terms and conditions of the cargo ramp agents' employment.  For example, the 2010 and 2013 CBAs each contain language that address breaks, overtime, and scheduling in Article 7.  Article 16 of each of the CBAs contains a detailed grievance procedure that ends in binding arbitration.  Article 19 of each of the CBAs provides that if any law or ruling affect any provision of the CBA, the parties would promptly start negotiations to address the affected provision.  Article 22 of each of the CBAs contains a provision regarding part-time employees.  Appendix "A" of each of the CBAs sets out the provisions for the hourly wage of cargo ramp agents.

### *ASII's Employee Information Guide, CBA, and Lack of Complaints re Breaks*

102.   I am also generally familiar with the Employee Information Guide that ASII provides to each new employee, including cargo ramp agents in Department 145.  A true and correct copy is attached to this Declaration as Exhibit 11 and by this reference it is incorporated herein.

103.   Mr. Perry received a copy of the Employee Information Guide.  A true and correct copy of the Employee Acknowledgement of receipt that he dated and signed on or about May 18, 2009, is attached to this Declaration as Exhibit 12 and by this reference it is incorporated herein.

44

104.   Mr. Perry also received a copy of the Kronos Time Clock Instructions. A true and correct copy of what he received and signed for on or about May 18, 2009, is attached to this Declaration as Exhibit 13 and by this reference it is incorporated herein.  It describes the employee's responsibilities to clock in and out for each work period, including meal breaks, tells the employee what to do if there is a problem, and provides the employee with the procedure to report not only time worked *but also exceptions*.  This would include the inability to take a break.

105.   There are a variety of posters located in the ASII Operations office that cargo ramp agents entered when they clocked in and out.  These posters explained the employee's rights under federal and state laws, including wage and hour laws.  The time clock that the Department 145 cargo ramp agents used is located in this office.

106.   The union that represented the Department 145 cargo ramp agent has filed grievances on a variety of matters under the grievance procedure in each of the CBAs.  When a grievance was filed involving a cargo ramp agent, ASII's Human Resources department would contact me about it.  The Human Resources department never told me that there was any grievance filed by the union or a Department 145 cargo ramp agent about not getting a meal or rest break for which the agent was not compensated, or that an agent was not paid overtime when overtime was due, or that an agent had not been paid for all hours worked.

107.   I believe that generally I maintained a good working relationship with the cargo ramp agents in Department 145.  Many cargo ramp agents came to me over the years to complain about various aspects of their job, raise a concern, or ask a question.  No cargo ramp agent ever indicated to me that there was any problem with them not being paid overtime when overtime was due, or not paid for all hours worked.

108.   In addition to coming to me, or going through the union, ASII has a "hotline" with an "800" number that employees can use to report problems,

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

concerns, or ask questions, including nonpayment of proper wages. Information about the hotline is contained in the Employee Information Guide that each employee receives. I was never made aware that any Department 145 cargo ramp agent made such a complaint about not getting a break (or not being paid if the break was missed), not being paid overtime when overtime was due, or not being paid for all hours worked.

### Final Pay

109.   ASII was notified in September 2011 that Mr. Perry's driver's license was going to be suspended effective October 15, 2011. He was required to have a valid driver's license in order to perform his job duties. ASII sent a letter to Mr. Perry dated September 20, 2011. ASII notified Mr. Perry of the situation and gave him until October 14, 2011 to rectify the issue with the Department of Motor Vehicles and to provide ASII with an H-6 form validating that he had a current driver's license. The letter told him that if he was not able to provide this documentation, his employment would be terminated. A true and correct copy of this letter is attached to this Declaration as Exhibit 14 and by this reference it is incorporated herein. This letter was sent to Mr. Perry at the most current address that he had on file with ASII.

110.   Mr. Perry never provided ASII with any evidence after September 20, 2011 that he had a valid and current driver's license. He was suspended when his driver's license was no longer valid. ASII's procedure is to suspend the employee until it can prepare and have a final paycheck available to the employee. The procedure is to then call the employee in to terminate him and give him the final paycheck. On October 20, 2011, ASII prepared a final paycheck for him. The information regarding that final paycheck is on page 1 of Exhibit 10 to this Declaration. It shows that the check was dated October 20, 2011, and cleared the bank on October 24, 2011. This check was mailed to Mr. Perry at the last known

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

1  address on file with ASII on October 20, 2011.  Mr. Perry was officially terminated
2  on October 21, 2011, as shown on Exhibit 15, which is a true and correct copy of
3  ASII's termination form and which is incorporated by this reference.  A true and
4  correct copy of the Termination Checklist for Mr. Perry is attached to this
5  Declaration as Exhibit 16 and by this reference it is incorporated herein.  The
6  Termination Checklist confirms that his final paycheck was mailed to him on
7  October 20, 2011, one day before his termination.  This was designed to get the
8  check to him by the date of his official termination.

10      ***Air Carrier Contracts and Competitive Pressure Affecting the Air***
11          ***Carrier's Prices, Services, and Routes***

12      111.   During my employment with ASII, I have had many conversations
13  with cargo air carrier representatives who told me that air carriers are extremely
14  sensitive to the costs they incur.

15      112.   One cargo air carrier told me that using ASII allowed it to bring more
16  flights to LAX than it had in the past.

17      113.   Over the years, cargo air carrier representatives have told me that they
18  used ASII to remain competitive or gain a competitive price edge over their
19  competitors.

20      I declare under penalty of perjury under the laws of the United States and the
21  State of California that the foregoing is true and correct.

22      Executed on _Sept 24_ , 2014, at Los Angeles, California.

24                                      _____
25                                      Guillermo Marron

57381 Marron Decl -r13                 47

CV13-00059-SVW (AGRx)
DECLARATION OF GUILLERMO MARRON

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2014, a copy of the following document was filed electronically:

**DECLARATION OF GUILLERMO MARRON IN SUPPORT OF DEFENDANT AIRCRAFT SERVICE INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's System:

> JONATHAN RICASA, ESQ.
> LAW OFFICE OF JONATHAN RICASA
> 2341 Westwood Blvd., Suite 7
> Los Angeles, CA  90064
> Email:  jricasa@ricassalaw.com
>
> KEITH A. JACOBY, ESQ.
> LITTLER MENDELSON P.C.
> 2049 Century Park East, 5th Floor
> Los Angeles, CA  90067-3107
> Email:  kjacoby@littler.com

DATED: October 14, 2014

GLADSTONE MICHEL
WEISBERG WILLNER & SLOANE, ALC

By:_____
    TERESA R. TRACY

Attorneys for AIRCRAFT SERVICE INTERNATIONAL, INC.
E-Mail:  ttracy@gladstonemichel.com

*GLADSTONE MICHEL WEISBERG WILLNER & SLOANE, ALC*